## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| GERALD K. SCHREIER, | : | Case No. 3:15-cv-145 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Chief Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Gerald Schreier applied for a period of disability and Disability Insurance Benefits on May 12, 2010.  He asserted that he could no longer work a substantial paid job as of April 15, 2009.  His application, medical records, and other evidence proceeded to a hearing before Administrative Law Judge (ALJ) Amelia Lombardo who denied Plaintiff's application based on her central conclusion that Plaintiff was not under a "disability" as defined in the Social Security Act.  The Appeals Council vacated the hearing decision and remanded the case to an ALJ.  Plaintiff's application, medical records, and other evidence then proceeded to a hearing before ALJ Larry A. Temin.  On December 5, 2013, ALJ Temin issued a decision finding that Plaintiff was not under a

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

"disability" as defined in the Social Security Act.  Plaintiff brings the present case

challenging ALJ Temin's non-disability decision.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the

Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #15),

the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for

further proceedings.  The Commissioner asks the Court to affirm ALJ Temin's non-

disability decision.

## II.   <u>Background</u>

Plaintiff asserts he has been under a "disability" since April 15, 2009.  He

protectively filed his application on May 12, 2010.  He was forty-one years old at the

time and was therefore considered a "younger person" under Social Security Regulations.

He has a limited education.  He worked as a welder and electrician helper in the past.

Plaintiff's significant health problems include avascular necrosis of the right ankle with

Achilles tendonitis, an anxiety disorder, and a pain disorder.

### A.   **Plaintiff's Testimony**

In July 2012, Plaintiff testified in a hearing before ALJ Lombardo that his "main

physical problem" is his ankle.  (Doc. #6, *PageID* #104).  He discussed ankle fusion

surgery with his treating orthopedic surgeon, Dr. Laughlin, but Dr. Laughlin did not

"think it's quite ready yet."  *Id.*  He attends pain management with Dr. Gupta, but the

medication only "[s]omewhat[,] [n]ot fully" controls his pain.  *Id.* at 105.  He testified

that he uses a cane prescribed by Dr. Laughlin and an orthotic device in his shoe. *Id.* at 106, 115.

Plaintiff estimated he could stand for fifteen minutes and could sit for thirty to forty-five minutes. *Id.* at 107. After sitting, he must move around or his "ankle tightens up." *Id.* He can walk a block with his cane. *Id.* Plaintiff rated his pain severity with medications at a level four on a zero to ten scale. *Id.* He explained that if he overexerts his foot, then his pain "can go up to a seven, with shooting pains of up to eight or nine." *Id.* at 114. He is able to do some household chores. *Id.* at 109. He watches television in his recliner. *Id.* at 112. He likes to fish but "can't quite fish the way I like to." *Id.* at 110.

On remand from the Appeals Council, ALJ Temin held a hearing in November 2013. Plaintiff testified that he last worked as a welder in 2006. *Id.* at 73. He is currently unable to work due to diffused avascular necrosis of the talus bone in his right ankle. *Id.* at 76. His ankle, foot, and Achilles tendon are "extremely" painful. *Id.* at 76-77. He denied any other physical problems. *Id.* at 78.

Plaintiff testified if he lifts too much, his foot gets sore. *Id.* at 80. He estimated that he can lift about twenty-five pounds and stand forty-five to sixty minutes before he needs to sit and elevate his leg. *Id.* at 80. He has been using a cane prescribed by Dr. McLaughlin for between one and two years. *Id.* at 81. He estimated that he can walk one block and has no problem sitting. *Id.* He can bend from the waist and reach without problems but has difficulty climbing stairs. *Id.*

3

Plaintiff testified that he reclines in his chair for most of the day to keep his foot elevated. *Id.* at 89. Dr. McLaughlin instructed him to elevate his leg "for the blood flow; to reduce the pain." *Id.* at 80. He could not remember the last time he spent over two hours without elevating his foot. *Id.* If he does not elevate his foot, he experiences the following:

> Well, first my foot, you get like a hot feeling. And then it kind of goes from the hot to, like, a pressure, like a lot of pressure, almost like pushing out on the foot. And then it will get into like a clamp, like your foot's in a clamp, kind of like throbbing, clamping. And nerve pain shooting up the legs.

*Id.*

Plaintiff lives with seven other people, including his parents and three daughters, in his parents' home. *Id.* at 84. He does not have any friends. *Id.* Over a month prior to the hearing, Plaintiff's license was suspended for refusing a breathalyzer test. *Id.* at 85. Before the suspension, he was able to drive. *Id.* at 86. He does not do household chores or go shopping. *Id.* He takes out the garbage using a wagon/tractor. *Id.* at 87. Although he likes to fish, he cannot fish as much as he used to, except for at the pond behind his father's home. *Id.* at 82. He goes fishing once or twice a week and can be on the dock for approximately one and one-half hours. *Id.* at 88.

### B. Vocational Expert Testimony

The Vocational Expert (VE) at the supplemental hearing, Robert E. Breslin, classified Plaintiff's past employment as a welder, at the skilled, medium exertional level,

and he classified a temporary position as an electrician helper, at the semi-skilled, heavy exertional position. *Id.* at 93.

In response to a hypothetical question, the VE testified that an individual with Plaintiff's residual functional capacity (as defined by ALJ Temin) could perform unskilled sedentary jobs. *Id.* at 93-95. For example, there are 1300 regional sedentary, unskilled assembly positions, 325 sedentary, unskilled inspector positions, and 100 sedentary, unskilled packaging positions. *Id.* The ALJ asked if the need to elevate the legs periodically during the workday for fifteen minutes would affect the ability to do those jobs, and the VE responded that "if he had to elevate them at times other than break times, [then] it would interfere with his ability to work." *Id.* at 95-96.

### C.    Relevant Medical Evidence

#### 1.    Stephen Weeber, D.P.M.

Plaintiff's primary care physician referred Plaintiff to Dr. Weeber, a podiatrist, in October 2009. *Id.* at 539. Dr. Weeber treated Plaintiff in 2009 and 2010. *Id.* at 378-403. At the initial exam in October 2009, Dr. Weeber noted he had swelling and pain with palpation of the Achilles tendon of the right limb, particularly in the watershed area as well as its insertion into the calcaneus. *Id.* at 382. Plaintiff reported discomfort anteriorly, and with maximal dorsiflexion, there was a slight crepitus sensation noted with palpation to the anterior ankle joint. *Id.* He had limited ability to dorsiflex his right ankle approximately five degrees short of ninety. *Id.* X-rays showed no apparent ankle joint pathology with normal joint space, normal alignment, and no spurring. *Id.* Dr.

Weeber assessed Achilles tendonitis as well as joint pain arthralgia in his right ankle due to the equinus contracture and probable joint contracture of the surrounding joint capsule exacerbated by his leg length discrepancy. *Id.* Dr. Weeber told him to wear his shoes at all times, use a slant board to stretch, and ice his Achilles tendon and anterior ankle three times a day for ten to fifteen minutes. *Id.*

On December 17, 2009, Dr. Weeber indicated that Plaintiff was not fully compliant with treatment, noting "it is not surprising that he has not had any improvement." *Id.* at 381. He received a cast boot on December 30, 2009, and by January 12, 2010, Dr. Weeber noted that with the boot, his right foot improved with deceased pain, but swelling was observed. *Id.* He had a seventy percent decrease in his right Achilles tendonitis. *Id.* at 378-79. On April 30, 2010, an MRI of Plaintiff's right ankle revealed necrosis in the talus, marked synovitis involving the tibiotalar joint, a small amount of stress related edema, a thickening of the AITF (anterior talofibular - ankle) ligament and subcutaneous edema. *Id.* at 386-88.

On June 2, 2010, Dr. Weeber completed a treating source statement. *Id.* at 390. Dr. Weeber reported that he last saw Plaintiff on May 4, 2010, and Plaintiff has a history of right ankle pain. *Id.* He has limited motion of the right ankle joint. *Id.* His gait is antalgic, and when walking, he does not push off of the right foot. *Id.* Plaintiff uses foot orthotics to help with discomfort. *Id.* Dr. Weeber described the symptoms and/or pain as "chronic low-grade aching that increased in correlation to the amount of time the patient is weightbearing." *Id.*

### 2. Richard Laughlin, M.D.

Plaintiff initially saw Dr. Laughlin, an orthopedic surgeon, in May 2010. *Id.* at 408. Plaintiff reported progressive ankle pain and occasional swelling. *Id.* He had difficulty with raising on his toes and some pain with subtalar joint motion. *Id.* Most of his pain was in the anterior ankle. *Id.* Mild swelling was noted in the anterior ankle. *Id.* Plaintiff otherwise had good pulses, skin, and sensation. *Id.* Dr. Laughlin diagnosed avascular necrosis and started Plaintiff with a brace. *Id.*

In August 2010, Plaintiff's brace was not helping. *Id.* at 448. Examination showed minimal swelling of the foot. *Id.* Dr. Laughlin noted that Plaintiff's condition was "not really far enough along yet to warrant effusion." *Id.* In March 2011, Dr. Laughlin noted that he was still using the brace, and his condition had not changed. *Id.* at 530. He advised Plaintiff to "wait as long as he [could]" before considering surgery, given that he still had "quite a bit of motion" in his ankle. *Id.* Dr. Laughlin also gave him a few other treatment options to consider, such as an injection, a core decompression, or a bone stimulator. *Id.* In September 2011, Dr. Laughlin found no new swelling or deformity, pain along the ankle joint line, and reasonable motion on examination. *Id.* at 529.

In November 2011, Dr. Laughlin completed a "Medical Impairment Questionnaire Regarding Ankle and Foot Problems." *Id.* at 546. Dr. McLaughlin opined that Plaintiff would need to elevate his legs occasionally during an eight-hour workday. *Id.* He also found that Plaintiff could stand thirty minutes at a time. *Id.* He could walk one block at a

7

reasonable pace, and he could walk long enough to shop or bank.  *Id.*  He could climb a few steps at a reasonable pace with the use of a single handrail.  *Id.*  Dr. Laughlin also indicated that Plaintiff's pain level is severe.  *Id.*  In November 2012, Dr. Laughlin supplemented his medical opinion, adding that Plaintiff's legs should be elevated at or above waist level.  *Id.* at 698.

When seen in March 2012, Plaintiff was using a cane to ambulate and intermittently using the brace.  *Id.* at 597-99.  He took pain medication prescribed by a pain-management specialist.  *Id.*  Examination notes indicate no swelling or warmth, limited active and passive motion, tenderness, and neurovascular intact.  *Id*.  Dr. Laughlin noted that Plaintiff was "doing well" and was "not ready for surgery at this time."  *Id*.

When seen for his yearly follow-up in March 2013, Plaintiff reported his pain was moderately well-controlled by pain management, and although he was still unable to work, he could tolerate a moderate amount of activity within the home.  *Id.* at 628.  He occasionally wore the brace.  *Id.*  Examination showed no swelling, warmth, or deformity and normal alignment.  *Id.*

### 3.    Suresh Gupta, M.D.

Plaintiff began treatment with Dr. Gupta, a pain-management specialist at the Pain Clinic at Dayton Outpatient Center, in February 2011.  *Id.* at 502-03.  Dr. Gupta diagnosed right ankle Synovitis, right ankle Avascular Necrosis, and right ankle strain/sprain.  *Id.*  Plaintiff continued treatment with Dr. Gupta's office approximately every month through at least July 2013.  *Id.* at 562-86, 588-96, 631-62.  Throughout that

time, Dr. Gupta prescribed varying doses of Relafen, Percocet, MS Contin, Methadone, Neurontin, and Vicodin. *Id.* Dr. Gupta's treatment records show that Plaintiff generally reported that his pain was controlled between forty percent and fifty percent. *Id.* Dr. Gupta also noted that his pain was aggravated by increased activity. *Id.*

### 4. Eric Schmittar, M.D.

Dr. Schmittar, an orthopedic surgeon, completed interrogatories and a medical source statement after his review of the evidence on September 10, 2013. *Id.* at 612-21. Dr. Schmittar opined that Plaintiff's ankle impairment is his only limiting factor and that "[t]here is certainly some ankle pain, but there is still no collapse of the talus and good range of motion. No deformity." *Id.* at 614-16. He found that Plaintiff is capable of lifting and carrying up to ten pounds continuously, up to twenty pounds frequently, and up to fifty pounds occasionally. *Id.* at 616. He can sit for six hours at one time for a total of seven hours during an eight-hour workday, stand for four hours at one time for a total of six hours during a workday, and walk two hours at one time for a total of four hours during a workday. *Id.* at 617. According to Dr. Schmittar, Plaintiff can occasionally operate right foot controls. *Id.* at 618. He can frequently climb stairs and ramps, and he can occasionally balance, stoop, kneel, crouch, crawl, and climb ladders or scaffolds. *Id.* at 619. Further, he can occasionally work around moving mechanical parts and frequently work around unprotected heights or operate a motor vehicle. *Id.* at 619-20. Dr. Schmittar opined that Plaintiff did not need a cane for ambulation. *Id.* at 617.

5.    **Gerald Klyop, M.D./Diane Manos, M.D.**

Plaintiff's record was reviewed by Dr. Klyop, a State agency physician, on May 2, 2010.  *Id.* at 467-95.  Dr. Klyop determined that Plaintiff could lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently and could stand and/or walk for a total of at least two hours and sit for a total of six hours in an eight-hour workday.  *Id.* at 468.  Dr. Klyop opined that due to his "less then favorable response" to treatment, "he should be able to stand and walk for a total of 4 hours in an 8 hour day (thirty minute incriments [sic])."  *Id.* at 469.  Dr. Klyop also found that he could never climb ladders, ropes, or scaffolds, and he could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.  *Id.*  He determined that Plaintiff should avoid heights and vibration.  *Id.* at 471.  Dr. Klyop's assessment was affirmed by Dr. Manos, another record-reviewing physician, on March 19, 2011.  *Id.* at 504.

III.    **<u>Standard of Review</u>**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

11

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Temin to evaluate the evidence connected to

Plaintiff's application for benefits.  He did so by considering each of the five sequential

steps set forth in the Social Security regulations.  *See* 20 C.F.R. § 404.1520.  He reached

the following main conclusions:

Step 1:  Plaintiff has not engaged in substantial gainful employment since April 15, 2009.

Step 2:  He has the severe impairments of avascular necrosis of the right ankle with Achilles tendonitis, an anxiety disorder, and a pain disorder.

Step 3:  He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:  His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consisted of his ability "to perform sedentary work... with the following limitations:  lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 2 hours in an eight-hour workday and sit up to 6 hours an eight-hour workday; and occasionally stoop, kneel, crouch, crawl and climb ramps/stairs.  He could not operate controls with the right lower extremity or perform other work requiring the forceful use of the right lower extremity.  He could not use vibratory tools or power tools, climb ladders/ropes/scaffolds, or work at unprotected heights or around hazardous machinery."  He is unable to perform any of his past relevant work.

Step 5:  He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 48-56).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 56.

## V.    Discussion

Plaintiff contends that the ALJ erred in failing to reasonably account for Plaintiff's need for leg elevation in his disability evaluation.  Plaintiff also argues the ALJ's weighing of the treating source opinion was unreasonable, unsupported, and inadequate, and the ALJ failed to adequately explain and support his deference to the opinions of non-examining sources.  Finally, Plaintiff argues the ALJ's findings regarding Plaintiff's treatment and activities are unsupported.  The Commissioner maintains that the ALJ reasonably evaluated medical opinions in the record and that substantial evidence supports the ALJ's credibility finding.

### A.    Dr. Laughlin and Plaintiff's Need to Elevate the Right Leg

The ALJ found that Dr. Laughlin's opinion "cannot be given controlling weight." (Doc. #6, PageID #53).  Social Security Regulations recognize several different categories of medical sources:  treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").    In other words, "[t]he regulations provide

13

> progressively more rigorous tests for weighing opinions as the ties between
> the source of the opinion and the individual become weaker.".

*Id.* (quoting in part Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at \*2 (Soc. Sec. Admin.

July 2, 1996), and citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)–(2)).  To effect this

hierarchy, the Regulations adopt the treating physician rule.  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two
> conditions are met: (1) the opinion "is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques"; and (2) the
> opinion "is not inconsistent with the other substantial evidence in [the] case
> record."

*Id.* at 376 (quoting in part 20 C.F.R. § 1527(c)(2)); *see Gentry*, 741 F.3d at 723.  If the

treating physician's opinion is not controlling, "the ALJ, in determining how much

weight is appropriate, must consider a host of factors, including the length, frequency,

nature, and extent of the treatment relationship; the supportability and consistency of the

physician's conclusions; the specialization of the physician; and any other relevant

factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

     In the present case, ALJ Temin determined, "Dr. McLaughlin's opinion cannot be

given controlling weight, as it is not well-supported by medically-acceptable clinical and

laboratory diagnostic techniques and is *not consistent* with the other substantial evidence

in the case record…."  (Doc. #6, PageID #53) (emphasis added).  In reaching this

conclusion, ALJ Temin applied the incorrect legal standard.  The treating physician rule

does not require that the physician's opinion be consistent with other substantial

evidence.  The physician's opinion need only be "not inconsistent" with other substantial

evidence in the case record.  20 C.F.R. § 404.1527(c)(2).  This is a significant substantive

14

difference. The Social Security Administration defines "not inconsistent" as "a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence)…." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *3 (Soc. Sec. Admin. July 2, 1996). Although ALJ Temin initially explains the treating physician rule correctly, in his explanation of the weight assigned to Dr. McLaughlin's opinion, he states three separate times that Dr. McLaughlin's opinion is "not consistent" with facts in the record. (Doc. #6, PageID #s 52-53).

In this manner, the ALJ required more of Dr. McLaughlin's opinions than the Regulations mandate. "An ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Gentry,* 741 D.3d at 722 (citing *Cole,* 661 F.3d at 937; *Blakley,* 581 F.3d at 407) (internal quotation marks omitted). Without the correct legal standard, the ALJ could not properly determine that Dr. McLaughlin's opinion is not entitled to controlling weight.

Even if Dr. McLaughlin's opinion was not entitled to controlling weight, substantial evidence does not support ALJ Temin's reasons for concluding that Dr. McLaughlin's opinion is only entitled to some weight. The ALJ first observed that Plaintiff's "condition was not severe enough to warrant fusion." (Doc. #6, PageID #53). However, this is not entirely true. Dr. McLaughlin's notes indicate that he wanted to try alternative treatment methods before subjecting Plaintiff to surgery. *Id.* at 408-09, 531.

15

As he explained to Plaintiff, the surgery would cause a noticeable change in the Plaintiff's range of motion and would only "hopefully… help with his pain." *Id.* at 530. When discussing whether surgery would be performed, Plaintiff explained, "[b]ecause the bone is dying, [] to go and put pins in, it would just be like shooting a screw in rotted wood." *Id.* at 108. He also stated that surgery "would not take the full pain away. The pain will still be there. It's just that I wouldn't be able to move my foot to increase the pain level." *Id.*

Similarly, substantial evidence does not support the ALJ's finding that Dr. Laughlin's statement that Plaintiff's level of pain is "severe" is not consistent with his own treatment records or with the pain management records. In May 2010, Dr. McLaughlin noted that Plaintiff complained of progressive ankle pain. *Id.* at 408. In March 2011, he noted that Plaintiff said, "his pain really has not gotten any better." *Id.* at 530. Dr. Weeber notes that "the more weightbearing he does the worse his symptoms get." *Id.* at 390. Notes from the Pain Clinic state that Plaintiff's pain was generally around a four on a scale from zero to ten. *Id.* at 501-86. However, the notes also indicate that the pain is aggravated by activity. *Id.* Thus, while the Plaintiff is unemployed and elevating his leg regularly, his pain level is approximately at four. But as Plaintiff explained, if he overexerts his foot, then his pain "can go up to a seven, with shooting pains of up to eight or nine." *Id.* at 114. Additionally, Plaintiff's pain is only managed by seeing a pain specialist approximately once a month with frequent changes in medication and doses.

16

Even the Appeals Council noted that Dr. Laughlin opined that Plaintiff would have to elevate his right leg *occasionally* during an eight-hour workday. *Id.* at 155 (emphasis added). Because the term "occasional" means "at least once up to one-third of an 8-hour workday…, the customary two 15-minute breaks and a customary 30-minute lunch period may not accommodate the need to 'occasionally' elevate the right leg." *Id.* at 155. The Appeals Council found that "further clarification of Dr. Laughlin's opinion, and specifically the frequency and duration of the claimant's need to elevate his right leg, is warranted." *Id.* Plaintiff is correct that the pertinent question on remand from the Appeals Council "was not whether or not Plaintiff needed to elevate his legs, but how much he needed to do so and whether or not the same would be work preclusive." (Doc. #9, *PageID* #715). Rather than addressing that pertinent question, the ALJ attempted to avoid it by finding that Dr. McLaughlin's opinion was only entitled to some weight. Further, the only clarification attempted before ALJ Temin's decision was a "Supplement to Medical Opinion" sent to Dr. McLaughlin that asked how high Plaintiff "should elevate his leg to achieve the goals of pain relief and swelling reduction." (Doc. #6, *PageID* #53). The supplemental questionnaire presented to Dr. McLaughlin did not contain any questions regarding the frequency and duration of Plaintiff's need to elevate his leg. *Id.* Assuming in the Commissioner's favor that the ALJ sent the supplemental questionnaire to Dr. McLaughlin – the record is not clear on this point – the ALJ took no further action to comply with the Appeals Council's instruction to clarify.

17

The ALJ also relies on the opinions from two non-examining State agency doctors, Dr. Klyop and Dr. Manos, and a medical expert, Dr. Schmittar, to support his finding that Dr. McLaughlin's opinion is only entitled to some weight.  The ALJ states that Dr. McLaughlin's opinion is not consistent with the opinions of the three doctors.  *Id.* at 53.  However, he fails to provide any examples of inconsistency.  Additionally, the ALJ fails to acknowledge the significant differences between Dr. Schmittar's opinion and those of Dr. Klyop and Dr. Manos.  *See infra* Section V.B.

To challenge Dr. McLaughlin's opinion that Plaintiff must elevate his leg, the ALJ asserts that Dr. Schmittar does not indicate that Plaintiff is required to elevate his leg or foot.  *Id.* at 53.  But, the ALJ does not acknowledge that Dr. Schmittar was not asked whether Plaintiff should elevate his foot, and if so, for how long.  Plaintiff correctly observed, "a review of the opinions of these sources reveals that none of them even minimally discussed leg elevation in either the affirmative or negative."  (Doc. #9, *PageID* #719) (citations omitted).  Because no other doctor addressed elevation, there is nothing in the record that can contradict or conflict with Dr. McLaughlin's opinion.  Further, Plaintiff's testimony that he elevates his leg during most of the day is consistent with Dr. McLaughlin's opinion.  (Doc. #6, *PageID* #89).

Additionally, although the ALJ criticizes Dr. McLaughlin's support for his opinion, the ALJ fails to criticize the lack of support for Drs. Klyop's, Manos', and Schmittar's opinions.  As will be discussed further, *infra* Section V.B., this constitutes error.  *Gayheart,* 710 F.3d at 379-80 ("[T]he regulations do not allow the application of

18

greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight.  Indeed, they call for just the opposite").  Dr. Klyop and Dr. Manos considered much less information than Dr. McLaughlin when they reviewed the record on September 13, 2010 and March 19, 2011, respectively.  (Doc. #6, *PageID* #s 467-74, 504).  Their reviews occurred well before Dr. McLaughlin provided his opinion in November 2011.  While Dr. Schmittar did examine all of Plaintiff's records, he failed to explain the rationale behind his determinations.  For example, under the section for lifting and carrying, the form asks the physician to "[i]dentify the particular medical or clinical findings… which support your assessment or any limitations and why the findings support the assessment."  In response, Dr. Schmittar's only comment was "[r]ight ankle pain is the only limiting factor."

For these reasons, substantial evidence does not support the ALJ's determination that Dr. McLaughlin's opinion is only entitled to some weight.

### B.    Opinions of the State Agency Consultants

For his next assignment of error, Plaintiff asserts that the ALJ failed to explain his deference to the opinions of Dr. Klyop, Dr. Manos, and Dr. Schmittar.  If the treating doctor's opinion is not given controlling weight, the ALJ must consider the following factors when weighing medical opinions: examining relationship, treatment relationship (including length, frequency, nature, and extent), supportability, consistency, specialization, and other relevant factors.  20 C.F.R. § 404.1527(c).  Social Security regulations require the ALJ to apply the same level of scrutiny in weighing opinions of

19

non-treating sources as applied to treating source opinions.  *Gayheart,* 710 F.3d at 379.

"A more rigorous scrutiny of the treating-source opinion than the nontreating and

nonexamining opinions is precisely the inverse of the analysis that the regulation

requires."  *Id.* (citing 20 C.F.R. § 404.1527(c); Soc. Sec. Rul. No. 96-6p, 1996 WL

374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

In the present case, the ALJ first summarized the doctors' assessments.  (Doc. #6,

*PageID* #s 52, 54).  Then, the ALJ found Dr. Klyop and Dr. Manos' assessments were

entitled to "significant weight, as [they are] consistent with the evidence of record and the

claimant's activities of daily living, summarized above."  *Id.* at 52.  Similarly, the ALJ

concluded that Dr. Schmittar's assessment "deserves significant weight, as being

consistent with the medical evidence of record and the signs and findings therein,

summarized above."  *Id.* at 54.

The ALJ did not adequately explain the reasons for the weight assigned to the

opinions from the State agency consultants.  The ALJ notes that the assessments are

consistent with the record as a whole but fails to point to any specific examples.  The ALJ

also fails to acknowledge discrepancies between Dr. Klyop and Dr. Manos' assessments

and Dr. Schmittar's assessment.  For example, Dr. Klyop states Plaintiff is able to stand

and walk for four hours in an eight-hour day *in thirty minute increments*.  *Id.* at 469.  In

comparison, Dr. Schmittar found that he could stand for four hours without interruption

and walk for two hours without interruption.  *Id.* at 617.  Additionally, the ALJ failed to

acknowledge any facts that detract from the weight given to the doctors' assessments.

Neither Dr. Klyop nor Dr. Manos reviewed all of Plaintiff's medical records. Dr. Klyop completed his assessment in September 2010; Dr. Manos completed her assessment in March 2011. As a result, they did not review Dr. McLaughlin's Medical Impairment Questionnaire or Supplement to Medical Opinion. The ALJ found that Dr. Schmittar "specifically noted" that Plaintiff does not need a cane for ambulation, but he "did [not] provide any finding that the claimant needed to elevate his legs." *Id.* at 54. However, the ALJ fails to note that Dr. Schmittar was asked specifically whether Plaintiff needs a cane, but he was *not* asked the key question – whether Plaintiff needs to elevate his leg.

Accordingly, Plaintiff's Statement of Errors is well taken.[2]

### C.    Remand is Warranted

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-47 (6th Cir. 2004); failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-

---

[2] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's assessment of Plaintiff's credibility is unwarranted.

26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is weak. *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is weak. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulation and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Disability Insurance Benefits should be granted.

22

**IT IS THEREFORE RECOMMENDED THAT**:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Gerald K. Schreier was under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.    The case be **TERMINATED** on the docket of this Court.

Date: July 6, 2016                                  *s/Sharon L. Ovington*
                                                    Sharon L. Ovington
                                                    Chief United States Magistrate Judge

23

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).